IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| WILLIE B. WHITE and MATTHEW LAWLER<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF ST. LOUIS, MISSOURI; CORRECTIONAL OFFICERS JOHN DOES and JANE DOES 1 through 8, in their individual capacity;<br><br>Defendants. | ) | Case No. _______________<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT**

COME NOW Plaintiff's Willie B. White and Matthew Lawler, and for their Complaint against the Defendants, state:

**PARTIES**

1. Plaintiff Willie White is a resident of the City of St. Louis, Missouri, and was detained in the City Justice Center at all times relevant to this Complaint.

2. Plaintiff Matthew Lawler is a resident of St. Louis County, Missouri, and was detained in the City Justice Center at all times relevant to this Complaint.

3. Defendant City of St. Louis, Missouri (the "City") is a political and geographic subdivision of the State of Missouri and is organized as a constitutional charter city under Article VI, section 19 of the Missouri Constitution. The City is a public entity responsible for oversight of the City Justice Center through the Division of Corrections within the Department of Public Safety.

4. Defendants John and Jane Does 1-8 (collectively the "Correctional Defendants") were employees of the City jails during the relevant time period. At all times relevant to the events

in this case, the Correctional Defendants were acting under color of law and within the scope of their employment with the City. The Correctional Defendants are sued here in their individual capacities.

## FACTUAL BACKGROUND

### A. Cruel, Unusual, and Inhumane Conditions in the Justice Center.

5. In the United States, people subject to pre-trial detention do not forfeit their constitutional rights. And they certainly don't forfeit their human dignity. Which makes the conduct of officials in the City of St. Louis in this case unbelievably atrocious.

6. During the period of May 19, 2023, to May 30, 2023, White and Lawler were incarcerated in the St. Louis City Justice Center ("Justice Center") as pre-trial detainees. During that time, they were herded into a "bullpen" with a total of fifteen people although the cell could only fit nine people. The "bullpen" is a transitional area for detainees after they have been arrested but before they have been fully processed into the jail.

7. Things got far worse—and far more disgusting—from there. As discussed further, below, the City and its supervisory personnel have a policy, pattern, and custom of shutting off water to toilets in prisoner cells as collective punishment and retaliation toward the detainee population. With an overcrowded "bullpen", the toilet backed up and, when it was eventually allowed to flush again, overflowed into the cell. Thus, while the Plaintiffs were in this overstuffed bullpen, the drain clogged due to other inmates vomiting, urinating, and defecating in the cell.

8. The Correctional Defendants did nothing to address this inhumane situation, and left the overcrowded bullpen in these conditions for at least eleven days. During this time, detainees obviously continued to need to relieve themselves of bodily waste, meaning the bullpen's inhumane conditions continued to get worse and worse as time went on.

9. It gets worse. Because the bullpen was overcrowded, Plaintiffs did not have bunks on which to sleep. They were given thin mattresses to place on the ground for sleeping instead. But these mattresses were not thick enough to prevent the floating human waste from coming onto them. As a result, Plaintiffs had no choice but to lay in human waste for days on end, while this waste breached the top of their thin an inadequate mattresses, soaking their clothing and pillows, pillow cases, or blankets they were provided.

10. The Correctional Officer Defendants failed to do anything to address the situation despite the inmates repeatedly complaining to them about their suffering. Instead, as the inmates became more and more desperate, the Correctional Officer Defendants refused to even open the door to the bullpen. They refused to provide cleaning products to the inmates to allow them to rectify the situation for themselves either. Indeed, one of the Correctional Officer Defendants even misrepresented that he would provide a mop and broom to the inmates, never following through on this promise while the inmates lived in these deplorable conditions.

11. It gets *even* worse. The "bullpen" includes what is called a "chuck hole" through which food and other items can be passed in and out of the bullpen. Because the Correctional Officer Defendants refused to open the bullpen door, the blankets, pillowcases, clothing, and other items covered in human filth were passed through this "chuck hole," resulting in the "chuck hole" itself becoming covered in the same human filth.

12. The Correctional Officer Defendants did not clean this "chuck hole" while it was covered in human filth, but still would only pass food through the disgusting "chuck hole," tainting the inmates' only source of sustenance with human waste, germs, and bacteria.

13. The Plaintiffs did not eat as a result of these unsanitary conditions. Plaintiff Lawler developed a staph infection due to the unsanitary conditions in the Justice Center as well. In

addition, they suffered severe emotional distress, mental anguish, pain, discomfort, and other forms of suffering and injury that further investigation will reveal.

**B. This is not an isolated incident but, rather, a widespread problem.**

14. The conduct alleged herein is part of a pervasive and longstanding problem when it comes to conditions in the Justice Center. Since 2020, at least eighteen detainees have died while in custody at the Justice Center, with protests erupting In November 2024 over conditions in the jail.[1]

15. These terrible conditions came to a head in 2024 under the supervision, policymaking of Superintendent of the Justice Center Adrian Barnes, Director of Public Safety Charles Coyle, Commissioner of Corrections Jennifer Clemons-Abdullah (the "Supervisors"). In a case remarkably similar to the present one, around March 2024, an attorney for an inmate in the Justice Center found her paralyzed client "lying in his own feces" and "denied access to a toilet and the use of both adult diapers and toilet paper." Like here, this terrible mistreatment occurred while the inmate was in the "bullpen." Likewise, in January 2024, an attorney found protruding from his inmate client's stomach "an untreated hernia that had swelled to the size of a cantaloupe."[2]

16. Rather than fix the deplorable conditions that existed before, during, and after the time Plaintiffs were incarcerated in the Justice Center, the City and Supervisors made and carried out a policy and practice of banning attorneys from bringing their phones into the facility to prevent photographic evidence of the conditions to be made public.[3]

17. Due to serious humanitarian concerns arising from this state of affairs, the St. Louis Board of Alderman passed legislation to require the Justice Center to allow attorneys easier access

---

[1] https://www.stlpr.org/government-politics-issues/2024-12-19/rev-darryl-gray-transparency-st-louis-city-justice-center
[2] *Id.*
[3] *Id.*

to their clients and the ability to bring their phones and laptops into the jail.[4] This legislation simply codified an order given by St. Louis City Circuit Judge Elizabeth Hogan, which provided that "Attorneys shall be permitted to bring to a client visit items that are necessary for the adequate representation of that client, including, but not limited to: "computers, cell phones, documents, books and writing utensils." (*See* Exhibit 1, Judge Hogan Access Order).

18. In addition, a class action complaint was filed against the City alleging a pattern and practice of shutting off water to detainee cells, resulting in the same inhumane conditions that the Plaintiffs have been exposed to in this case. In that case, the City filed a motion for summary judgment against a *Monell* claim, which was denied. (*See* Exhibit 2, Judge Autrey Memorandum and Order, March 31, 2024).

19. The Supervisors knew of the deplorable conditions faced by Plaintiffs and other inmates, including the specific conditions the Plaintiffs encountered in May or June of 2023. They were deliberately indifferent toward the suffering and indignities caused to the Plaintiffs by their actions and inactions.

20. In particular, as early as 2020, pursuant to their role as policymakers for the City, the Supervisors promulgated and employed a pattern, practice, and policy of shutting off water to the cells of pre-trial detainees for minor "infractions" such as talking back, banging on cell doors, or having an "attitude" with staff. In Justice Center cells, detainees are expected to access drinking water from a sink on top of the toilet in the cell. The same water supply provides drinking water and water for the toilet to flush. These regular water stoppages would result in the clogging of toilets and drainage systems as detainees had to do what all human beings need to do from time to time: expel bodily fluids and solids.

[4] https://www.stlpr.org/law-order/2024-08-02/new-laws-make-it-clear-who-can-access-st-louis-jail-and-when

21. In this case, upon information and belief, in accordance with this policy imposed by the Supervisor Defendants and the City, the water was shut off in the cell in which the Plaintiffs were housed while the Correctional Defendants refused, resulting in the drain clogging that lead to the spreading of human waste.

22. With deliberate indifference to the suffering of the Plaintiffs and others, and in furtherance of the policy of using water shut-offs to punish detainees, the Correctional Defendants: (a) refused to clean the cell and thus eliminate the inhumane conditions; (b) refused to furnish supplies to clean the cell to aid the detainees in eliminating the inhumane conditions; (c) refused to move the detainees to another cell in which humane conditions existed; and (d) continued to only furnish food in an inhumane and disgusting manner through a "chuck hole" through which fabric with human waste was conveyed.

23. These water shut-offs also result in stress, headaches, dehydration, and making inmates feel as though they will die. The stress and fear is exacerbated by the fact that the Correctional Defendants—pursuant to the policy and practice created by the City and Supervisor Defendants—routinely threaten to shut off the water for retaliatory purposes and use the water shut-offs for punitive purposes and as a way to control the behavior of detainees.

24. The water shut off was not the result of any equipment failure, plumbing issue, or maintenance related reason, but was instead done to punish Plaintiffs and the other detainees. These detainees went days in inhumane conditions, surrounded by human waste, as a result of the pattern, practice, and policy created by the City and the Supervisor Defendants. Again, these conditions were imposed in an intentional, punitive, and retaliatory manner.

## JURISDICTION AND VENUE

25. Plaintiffs bring this action pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of their rights as secured by the Fourteenth Amendment to the United States Constitution. This Court therefore has jurisdiction pursuant to 28 U.S.C. § 1331.

26. Venue is appropriate in this district pursuant to 28 U.S.C. § 1391(e) because a substantial part of the events giving rise to the claims asserted occurred in this judicial district. Divisional venue is proper in the Eastern Division because a substantial part of the events giving rise to Plaintiffs' claims arose in the City of St. Louis E.D.Mo. L.R. 2.07(A)(1), (B)(1).

## COUNT I
## Conditions of Confinement Amounting to Punishment in Violation of the Fourteenth Amendment under 42 U.S.C. § 1983
## (Both Plaintiffs Against Defendants John and Jane Does 1-8)

27. Plaintiffs incorporate all preceding paragraphs as if fully set forth in this Court.

28. The Correctional Defendants purposefully or knowingly took actions to cut off the water source bringing water to the cell in which Plaintiffs were held, refused to clean the cell and thus eliminate the inhumane conditions, refused to furnish supplies to clean the cell to aid the detainees in eliminating the inhumane conditions, refused to move the detainees to another cell in which humane conditions existed, and continued to only furnish food in an inhumane and disgusting manner through a "chuck hole" through which fabric with human waste was conveyed.

29. These actions were taken to collectively punish entire groups of detainees for speech, minor infractions, or misbehavior even though such speech, minor infractions, or misbehavior were not committed by the Plaintiffs.

30. Alternatively, the Correctional Defendants actions were not rationally connected to a legitimate non-punitive purpose and were excessive in relation to any such legitimate purpose.

31. Alternatively, the Correctional Defendants acted intentionally improperly create inhumane conditions for detainees, including Plaintiffs, or recklessly failed to act with reasonable

care to mitigate the risk of subjecting detainees, including Plaintiffs, to inhumane conditions even though they knew, or should have known, that such conditions posed an excessive risk to health or safety.

32. In any of these ways, the Correctional Defendants acted with deliberate indifference toward the safety and rights of the Plaintiffs.

33. The Correctional Defendants' above-described actions violated the Plaintiffs' Eighth Amendment right to be free from cruel and unusual punishment as incorporated to the states under the Fourteenth Amendment.

34. The Correctional Defendants' above-described actions were undertaken with malice and/or reckless disregard for Plaintiffs' constitutional rights.

35. The Correctional Defendants' actions or inactions were the direct and proximate cause of the violations of Plaintiff's constitutional rights and the damages suffered by Plaintiffs, including pain, suffering, and emotional distress.

WHEREFORE, Plaintiffs pray this Court enter judgment in their favor against Defendants John and Jane Does 1-8, award compensatory damages to Plaintiffs, nominal damages to Plaintiffs, costs and attorneys' fees, punitive damages, and such additional relief as this Court may deem just.

## COUNT II
## *Monell* Claim for Conditions of Confinement Amounting to Punishment in Violation of the Fourteenth Amendment under 42 U.S.C. § 1983
## (Both Plaintiffs Against the City of St. Louis)

36. Plaintiffs incorporate all preceding paragraphs as if fully set forth in this Count.

37. Plaintiffs and countless others have been subjected to punitive and retaliatory water shut-offs, resulting in the inhumane build-up of humane waste in detainee cells, as the City Justice Center. These deprivations occur sporadically but regularly, and are imposed not in response to misconduct related to plumbing, but as punishment for minor and non-threatening misconduct

given on a collective basis without regard for the particular detainees that may, allegedly, be asking questions or "getting an attitude." These shut-offs have persisted for months, or perhaps years.

38. During the relevant time period, Superintendent Adrian Barnes, Director of Public Safety Charles Coyle, Commissioner of Corrections Jennifer Clemons-Abdullah and their predecessors had or should have had notice of widespread practices by employees at the Justice Center under which detainees were intentionally deprived of drinking water and water for their toilets, the spread of human waste as result of these deprivations, and the malicious purpose of infliction of pain and punishment that animated these actions.

39. These widespread practices were allowed to flourish and become so well-settled as to constitute de facto policy of the City Justice Center because governmental policymakers with authority over the jail—including Superintendent Adrian Barnes, Director of Public Safety Charles Coyle, and Commissioner of Corrections Jennifer Clemons-Abdullah—exhibited deliberate indifference to the problem, thereby effectively ratifying it.

40. These practices are also allowed to flourish because City Justice Center staff fail to apprise detainees of the jail's grievance process, and routinely obstruct and completely disregard detainee grievances, requests, and other complaints so as to cover up and insulate staff from repercussions when targeting and abusing detainees.

41. The City's above-described widespread practices violated the Plaintiffs' Eighth Amendment right to be free from cruel and unusual punishment as incorporated to the states under the Fourteenth Amendment.

42. Plaintiffs' injuries were caused in substantial part by these widespread policies, practices, and procedures promulgated by the City Justice Center.

WHEREFORE, Plaintiffs pray this Court enter judgment in their favor against the City, award nominal damages, compensatory damages, costs and attorney's fees, and such further relief as this Court may deem just.

**PLAINTIFFS DEMAND TRIAL BY JURY**

Respectfully Submitted,
SWMW LAW, LLC

By: ***/s/ Benjamin S. McIntosh***

Benjamin S. McIntosh, #68248MO
bmcintosh@swmwlaw.com
Attorney for Plaintiffs
701 Market Street, Suite 1000
St. Louis, MO 63101
(314) 480-5180
(314) 932-1566 – Facsimile